Filed 9/12/24  In re Alexander R. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ALEXANDER R., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT, <br><br> Plaintiff and Respondent, <br> v. <br> T.R., <br><br> Defendant and Appellant. | A170143 <br><br> (Solano County <br> Super. Ct. No. J45386) |

T.R. (Father) appeals an order terminating his parental rights to his son, Alexander R. (Alexander).  He contends the juvenile court applied improper standards in considering the parental-benefit exception to the statutory preference for adoption as a permanent plan.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

We are familiar with the background of this case from our review of Father's petition for extraordinary relief after the juvenile court terminated reunification services.  (*T.R. v. Superior Court* (Dec. 12, 2023, A168809) [nonpub. opn.].)  Most of the facts recited in our earlier opinion have no direct

1

bearing on the issues raised in this appeal, and we will not repeat them in detail here.

***Earlier Proceedings***

To summarize briefly, Alexander tested positive for methamphetamine after he was born in November 2021. He was immediately removed from his parents' custody and placed in a foster home, where he has remained his entire life. The juvenile court sustained allegations, among others, that Alexander's mother (Mother) and Alexander tested positive for methamphetamine at the time of his birth, that Mother had untreated mental health and substance abuse disorders, that Alexander was at substantial risk of physical harm and/or neglect because Father was unaware Mother was using drugs despite living in the same home, and that he worked outside the home, preventing him from protecting Alexander from Mother's drug use.

Mother and Father received reunification services, but over the next two years they failed to reunify with Alexander, and on September 27, 2023, the juvenile court terminated reunification services and set a hearing pursuant to Welfare and Institutions Code section 366.26.[1] We denied Father's petition for extraordinary relief.

***Visits with Alexander***

Father visited Alexander throughout the reunification period, and he continued to visit with Alexander twice a month after services were terminated.

At the outset, the parents' visits were supervised and took place twice a week for two hours. Father behaved appropriately during visits and cared for Alexander's needs. In August 2022, the visits became monitored rather than

---

[1] All statutory references are to the Welfare and Institutions Code.

supervised.  The monitored visits were "great."  In October, the visits were modified to one visit a week for three hours, and they were again supervised because of Mother's drug use.  Apparently in early 2023, a social worker for the Solano County Health and Social Services Department (the Department) suggested increasing the visits, with one visit with both parents each week and two individual visits, but Father refused increased visits without Mother's presence.  The visits were generally positive; Father would lift Alexander playfully in the air, give him hugs, and tickle him, and they would play with toys together.  Alexander appeared to enjoy these activities.

For a time in the spring of 2023, Father had unsupervised visits with Alexander in the home; Mother was not allowed to be present at those visits. The visits reverted to being supervised in June, when the Department had reason to believe Mother had nevertheless been at the home while Alexander was there, and a foster parent reported Alexander sometimes smelled of marijuana when returning from home visits.

In a report from January 2024, the foster parents recounted that school staff had informed them that after visits Alexander regressed, displayed aggressive behavior toward his peers, was unable to regulate his emotions, struggled with his daily routines, and was defiant.

### The Section 366.26 Hearing

The report for the section 366.26 hearing explained that Alexander's foster parents met all his needs, Alexander had a secure attachment to them, and they were committed to adopting him.

The contested section 366.26 hearing took place on March 27, 2024.

Father testified to his bond with Alexander.  He recounted that at one point during the dependency, he had unsupervised visits with Alexander, during which they played together, he read to Alexander, he fed him, and he

3

changed his diaper. Currently, Father and Mother were visiting with Alexander once a month for two hours at the Department, where they played with the toys that were there. Mother and Father would also bring trucks or toys as well as snacks to the visits. They would feed Alexander and change his diaper if necessary. When Alexander saw Father, he was happy to see him and usually ran right into his arms, and he called him " 'Dad' " or " 'Daddy.' " At the end of visits, he and Mother would give Alexander hugs and kisses and tell him they loved him, and get him ready to leave. He described Alexander as being the "world" to him.

The social worker assigned to the case testified that Father's last visit with Alexander had been in February. At the end of the visit, Alexander had a "baggy" diaper, which was a concern because he was prone to diaper rashes. The social worker testified that when Alexander arrived for visits, he ran into the visitation room to find a particular toy he liked. At the end of the visits, Alexander was not upset about returning to his foster parents' care; asked about this, the social worker said, "there's no [e]ffect on Alexander after his visits." The caregivers had not reported any negative effects when the number of visits were reduced. And Alexander called his foster parents "[M]ommy" and "[D]addy."

The juvenile court found the parental-benefit exception to the preference for adoption did not apply. It first found that the parents had been consistent in their visits with Alexander, with the exception of a few occasions that were not their fault. In considering whether Alexander had a substantial positive emotional attachment to the parents, the court acknowledged that the visits went well, that Alexander and the parents enjoyed them, and that they spent the time together playing and interacting. The court recognized the parents' emotional attachment to Alexander. But,

4

considering the matter from Alexander's perspective, the court noted that Alexander was only two years old and could not yet express his views with words. His behavior showed that he enjoyed the visits, he had fun with his parents, he enjoyed the setting and the toys, and he called his parents Mom and Dad. However, he had no trouble returning to the foster parents when the visits were over. The court explained, "I did not hear anything in terms of the minor's behavior after the visits that would indicate to me that there was more to this relationship than a positive friendly visit with the parents." The court said it had been looking for signs that Alexander was unwilling to leave the parents, such as crying or loss of control, or signs of depression, sadness, or behavioral changes in the foster parents' home after visits, but said it did not hear any. The court concluded, "[T]he Court does find that [Alexander], who is [two] years old, who has spent all of his life in foster care[,] would benefit from a stable permanent home and that the termination of parental rights does not outweigh the permanency that the substitute care-provider[s'] home is able to offer the minor, so the Court is going to terminate parental rights."

Father has appealed from this order.

## DISCUSSION

### *Legal Landscape*

When parents have failed to reunify with a child within the statutory time limits, the dependency statutes require the juvenile court to hold a section 366.26 hearing, at which it selects a permanent plan for the child. (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) The Legislature has listed a number of possible permanent plans, with the first in preference being termination of parental rights and placement of the child for adoption, which it "shall" order if it finds the child is adoptable, as Alexander

5

indisputably is.  (§ 366.26, subds. (b), (c)(1).)  Other possible permanent plans, lower in preference, include appointing a legal guardian.  (§ 366.26, subds. (b)(2) & (b)(4).)  "The Legislature has thus determined that, where possible, adoption is the first choice . . . 'because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]  'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

There are exceptions to the preference for termination of parental rights and adoption, however.  One exists if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" due to any of various circumstances, among them that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  This "parental-benefit" exception is at issue here.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 629.)

Our high court had occasion in *Caden C.* to discuss the meaning and interpretation of this exception at length.  The court explained that "the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.)  That is, "in assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]  By making this decision, the trial court determines whether

6

terminating parental rights serves the child's best interests." (*Id*. at p. 632, citing *In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.)

There are three elements to this inquiry. The first is whether the parents visit the child consistently, to the extent allowed by court orders. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The Department concedes that Father has done so, and the juvenile court so found.

The second element is whether continuation of the relationship would benefit the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing § 366.26, subd. (c)(1)(B)(i).) The focus here is on the child; and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C.*, at p. 632, quoting *In re Autumn H. supra*, 27 Cal.App.4th at p. 576.) In making this inquiry, courts may consider how children interact with their parents or look to them to determine the significance of the bond. (*Caden C.*, at p. 632.) We review the court's determination of this element for substantial evidence. (*Id*. at pp. 639–640.)

The third element of the inquiry is whether termination of parental rights would be detrimental to the child due to the parental relationship, assuming that the relationship will terminate along with the parent's rights. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court needs to determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life," bearing in mind not only the potentially negative effects but also the fact that "a new, stable home may . . . provid[e] a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid*.)

In making this inquiry, the court does not compare the parent's ability to care for the child to that of any potential adoptive parent, for "[e]ven where it may never make sense to permit the child to live with the parent, termination may be detrimental" to the child. (*Caden C.*, *supra,* 11 Cal.5th at p. 634.) Rather, "the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid*.) This determination is reviewed for abuse of discretion. (*Id*. at p. 640.)

*Analysis*

With these standards in mind, we consider Father's contentions. Father first argues that the juvenile court's evaluation of the second step of the analysis—whether continuing the relationship would benefit Alexander— did not comport with *Caden C.* He tells us that throughout the dependency proceedings his visits with Alexander were positive, that he played with Alexander, read to him, and fed him, and was "basically . . . a father figure," and that Alexander was happy to see him and called him " '[D]ad.' " This evidence, he argues, is relevant to whether Alexander had a significant emotional attachment to him. But, Father contends, the juvenile court "dismissed" these successful visits, focusing instead on Alexander's behavior after the visits. Even there, he argues, the trial court relied only on the evidence that Alexander showed no distress when visits ended, and it neglected to mention the evidence that school staff reported that after visits Alexander regressed, struggled with daily routines, and was aggressive at school.

We are not persuaded the juvenile court's comments showed it relied on impermissible factors. The court discussed the evidence it viewed as tending to show the strength of the relationship between Father and Alexander. In so

8

doing, it specifically noted that the visits went well, Father engaged with Alexander by playing with him and reading to him, both the parents and Alexander enjoyed the visits, and Alexander had a relationship with his parents. The court then went on to evaluate whether the attachment from Alexander's perspective was "substantial." From its discussion of the evidence, particularly the absence of evidence that Alexander was upset to leave his parents at the end of visits, the juvenile court appears to have concluded the second element was not established, though instead of expressly stating a finding on the ultimate issue in the second element, it moved directly to its finding on the third element, concluding that "termination of parental rights does not outweigh" the benefits that permanent adoption would offer. We see nothing improper here. A juvenile court need not recite specific findings regarding all three elements in finding the parental-benefit exception inapplicable. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) And Father's allegation that the juvenile court overlooked evidence contrary to its conclusions ignores that the court was not required to recite all the evidence it considered. (*Ibid.*)

Specifically, Father's reliance on Alexander's reported behavior at school after visits is not persuasive. The court indicated it was looking at whether Alexander showed distress when visits ended, such as crying or not wanting to go, or when he returned to the foster parents' home, and said it saw no such evidence. It appears from the record that Alexander's behavioral problems took place at his school, rather than at his foster home, and that school staff reported the behavior to the foster parents. In any case, even if some of this behavior took place in the foster home, Father had the burden to show the parental-benefit exception applied (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809), and he did not urge the court to look to these reported

9

behavioral problems. Instead, he argued that Alexander's ease in making the transition from the visits to the foster home showed he was comfortable with his routine.

Father also suggests that, in evaluating the second step, the trial court improperly considered whether he occupied a "parental role" in Alexander's life, rather than whether Alexander had a substantial, positive emotional attachment from which he would benefit. (See *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229–1230; *In re D.M.* (2021) 71 Cal.App.5th 261, 271 ["The court's express findings that father did not act like a parent demonstrate it considered factors which *Caden C.* has explained are inappropriate" in this context].) To the contrary, the juvenile court's ruling shows its focus was on the importance of the bond to Alexander, not whether Father occupied a "parental" role in his life.

Thus, there is no indication the trial court considered impermissible factors, and we are persuaded there is substantial evidence to support the juvenile court's findings on the second step of the analysis.

As to the third step of the analysis, Father contends that the juvenile court again considered improper factors when it evaluated whether the security and permanence Alexander would gain in an adoptive home would outweigh the harm of losing his relationship with Father. He points to the court's brief explanation: "[T]he Court [finds] that the minor, who is [two] years old, who has spent all of his life in foster care[,] would benefit from a stable permanent home and that the termination of parental rights does not outweigh the permanency that the substitute care-provider[s'] home is able to offer the minor." This statement, Father asserts, shows that the juvenile court improperly compared his attributes as a custodial care provider to that of the foster parents. (See *Caden C.*, *supra*, 11 Cal.5th at p. 634 [court does

10

not compare parent's ability to care for child with that of prospective adoptive parents]; accord, *In re A.L.*, *supra*, 78 Cal.App.5th at p. 1157.) And, he suggests, the court's comments show that it erroneously believed Alexander would be removed from the foster home if parental rights were not terminated.

The juvenile court's comments are not reasonably susceptible to the interpretation Father posits. The accurate observation that Alexander had never been in Father's custody does not imply a comparison of his abilities as a parent to those of the foster parents. Rather, the court could appropriately take into account " 'the portion of the child's life spent in the parent's custody' " in evaluating the strength of their relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) And its comment on the benefit Alexander would receive from a stable permanent home is fully in line with the legislative preference for adoption as a source of permanency and " '[a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.) We see no abuse of discretion in the juvenile court's conclusion that the benefits of Alexander's bond with Father do not outweigh the benefits of adoption.

Although we reach this conclusion, we emphasize that we have no doubt of Father's love for Alexander or of the warmth of the relationship they share during visits. It is possible that the adoptive parents will conclude it is in Alexander's best interest to maintain some continuing relationship with Father, but we must leave that decision to the adoptive parents because we find no error or abuse of discretion in the juvenile court's determination that the parental-benefit exception does not apply in this case.

## DISPOSITION

The order is affirmed.

11

TUCHER, P. J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

*In re Alexander R.* (A170143)